1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

8

## DISTRICT OF NEVADA

9
10

JAMES S. TATE, JR. M.D.,

11

    Plaintiff,                                    Case No. 2:09-cv-01748-LDG (RJJ)

12

v.                                                    **ORDER**

13

UNIVERSITY MEDICAL CENTER OF
SOUTHERN NEVADA, *et al*.,

14
15

    Defendants.

16
17

      The plaintiff, James S. Tate, Jr. M.D., brought this suit against Peter Mansky, M.D.,

18

and others.  Mansky moves to dismiss the complaint (##22,24), but has submitted

19

evidence upon which he relies.  Tate opposes the motion (#25).  In so doing, Tate treats

20

Manksy's motion as one for summary judgment and he has submitted evidence upon

21

which he relies.  The Court has considered the evidence and will consider the motion as

22

brought pursuant to Fed. R. Civ. Pro. 56.  As Tate treated the motion as brought pursuant

23

to Rule 56, and submitted evidence, he has had an adequate opportunity to respond to the

24

motion as a Rule 56 motion.  Accordingly, Mansky's motion is ripe for consideration.

25

Having considered the pleadings, the evidence submitted by both parties, and the

26

arguments, the Court will grant summary judgment in favor of Manksy.

1      Motion for Summary Judgment

2          In considering a motion for summary judgment, the court performs "the threshold

3   inquiry of determining whether there is the need for a trial—whether, in other words, there

4   are any genuine factual issues that properly can be resolved only by a finder of fact

5   because they may reasonably be resolved in favor of either party." *Anderson v. Liberty

6   Lobby, Inc.*, 477 U.S. 242, 250 (1986).  To succeed on a motion for summary judgment,

7   the moving party must show (1) the lack of a genuine issue of any material fact, and (2)

8   that the court may grant judgment as a matter of law.  Fed. R. Civ. Pro. 56(c);  *Celotex

9   Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

10         A material fact is one required to prove a basic element of a claim.  *Anderson,* 477

11   U.S. at 248.  The failure to show a fact essential to one element, however, "necessarily

12   renders all other facts immaterial."  *Celotex*, 477 U.S. at 323.

13         "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after

14   adequate time for discovery and upon motion, against a party who fails to make a showing

15   sufficient to establish the existence of an element essential to that party's case, and on

16   which that party will bear the burden of proof at trial."  *Id*.  "Of course, a party seeking

17   summary judgment always bears the initial responsibility of informing the district court of

18   the basis for its motion, and identifying those portions of 'the pleadings, depositions,

19   answers to interrogatories, and admissions on file, together with the affidavits, if any,' which

20   it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*, 477 U.S.

21   at 323.  As such, when the non-moving party bears the initial burden of proving, at trial, the

22   claim or defense that the motion for summary judgment places in issue, the moving party

23   can meet its initial burden on summary judgment "by 'showing'–that is, pointing out to the

24   district court–that there is an absence of evidence to support the nonmoving party's case."

25   *Celotex*, 477 U.S. at 325.  Conversely, when the burden of proof at trial rests on the party

26

1  moving for summary judgment, then in moving for summary judgment the party must

2  establish each element of its case.

3       Once the moving party meets its initial burden on summary judgment, the non-

4  moving party must submit facts showing a genuine issue of material fact.  Fed. R. Civ. Pro.

5  56(e).  As summary judgment allows a court "to isolate and dispose of factually

6  unsupported claims or defenses," *Celotex*, 477 U.S. at 323-24, the court construes the

7  evidence before it "in the light most favorable to the opposing party."  *Adickes v. S. H.*

8  *Kress & Co.*, 398 U.S. 144, 157 (1970).  The allegations or denials of a pleading, however,

9  will not defeat a well-founded motion.  Fed. R. Civ. Pro. 56(e); *Matsushita Elec. Indus. Co.*

10  *v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

11       <u>Background</u>

12       As alleged by Tate in his complaint, on October 28, 2008, the Medical Executive

13  Committee ("MEC") of co-defendant The Medical and Dental Staff of UMC ("Medical Staff")

14  voted to re-credential Tate for a three-month term, and imposed certain requirements to be

15  completed by Tate.

16       On November 18, 2008, co-defendants Steve Sisolak, Tom Collins, Larry Brown,

17  Lawrence Weekly, Chris Giunchigliani, Susan Brager, and Rory Reid, acting collectively in

18  their official capacity as the Board of Trustees ("Trustees") of co-defendant University

19  Medical Center of Southern Nevada ("UMC"), approved the MEC's three-month re-

20  credentialing of Tate.  The MEC then notified Tate that it had approved his re-credentialing

21  for a term of three months, and that during this three-month period Tate was required to

22  obtain and provide the MEC with:

23       "1.    A full mental and physical evaluation under the auspices of the Nevada
            Health Professionals Assistance Foundation.

24

25       2.    An evaluation for drug and alcohol dependent [sic] under the auspices of the
            Nevada Health Professionals Assistance Foundation.

26

3.    Demonstrate evidence of enrollment in an anger management program under the auspices of the Nevada Health Professionals Assistance Foundation."

Complaint, ¶ 41.

The undisputed evidence establishes that Mansky is the Director of the Nevada Health Professionals Assistance Foundation ("Foundation").  The Foundation is used by the State Board of Medical Examiners and the State Osteopathic Board as a diversionary program for troubled practitioners.   The Foundation uses an "illness or wellness approach based on independent medical evaluation, treatment, and monitoring."  Mansky Declaration, ¶ 5.  As summarized by Mansky: The Foundation

> facilitate[s] evaluation and treatment of clinicians suffering from addictive, psychiatric illness or difficulty coping effectively with their work environment or stress inherent in the practice of medicine.  The [Foundation] does not treat, or enter into a physician-patient relationship or diagnose those who seek to participate in the foundation.  The [Foundation] works to facilitate evaluation for clinicians who appropriately enter the program by signing [the Foundation's] Conditions For Participation agreement and are accepted.

Before a professional is accepted into the program he must pay for and complete an initial interview and provide toxicology samples, agree to and sign a "CFP for Evaluation,"[1] and must complete a "Participant Profile."  The Foundation works directly with the professional and not through an intermediary.

Sometime in December 2008, Tate's counsel made an initial inquiry with Mansky. Mansky provided a brief written explanation of the Foundation's program to Tate's counsel. The letter explained the Nevada Health Professional Program, indicating that participation in the program is voluntary, that recommendations for treatment are determined based on Independent Medical Evaluations, and that a "requirement for working with the [program] is to work directly with participants not through a third party representing the clinician." Exhibit 5 to Mansky's Motion.  On December 18, 2008, Mansky sent Tate's counsel an e-

---

[1]    The Foundation's Conditions For Participation for Evaluation.

4

1    mail.  Manksy noted that while a hospital may mandate a professional's participation in the

2    program, the Foundation would only "accept a physician for participation if he/she makes a

3    voluntary decision to enter our program."  Exhibit 6 to Mansky's Motion.  In the same e-

4    mail, Mansky informed counsel that Tate could "request that he be interviewed for program

5    participation," and that "[a]fter the interview it is likely that we would request that Dr. Tate

6    undergo a multidisciplinary Independent Medical Evaluation at a National Center which

7    deals with physicians and is approved by our program."  Id.  Mansky further informed

8    Tate's counsel that Tate would "need[] to contact the [program] himself and to appear by

9    himself for the interview."  Id.

10          On January 7, 2009, Tate contacted the Foundation by e-mail.  Mansky responded

11    by e-mail, to which was attached the Participant Profile, which Mansky requested be

12    completed and returned.  Mansky further indicated that Tate would need to "include a 5

13    page statement (app. 1200 words) concerning the incidences of behavior that have been of

14    concern to the hospital in the past and the present incident," which would need to be

15    returned by January 15, 2009.  Exhibit 7 to Mansky's Motion.  Mansky further indicated that

16    he had reserved time on January 19th, for an interview with Tate.  Mansky reiterated that

17    the program was a voluntary program.  Id.  He further stated: "if you want to participate in

18    the [program] you must agree to work and communicate with the [program] directly and not

19    through a third party or third party intervention."  Id.  Mansky also attached copies of the

20    letter and e-mail sent to Tate's counsel.

21          The initial interview was re-scheduled to January 26, 2009.  Contrary to the

22    instruction that Tate would need to appear at the interview by himself, he appeared

23    accompanied by his counsel.  Tate was advised that if he wished to become a participant

24    in the program, he had to do so alone and without his attorney.  Tate insisted that his

25    counsel be present during the interview.

26

1   Tate asserts that he returned the Participant Profile prior to the interview, but also
2   asserts that he signed it in front of Mansky.  Mansky asserts that Tate returned the medical
3   profile on February 5, 2009, though the profile did not include information on a substance
4   that was detected in the toxicology screening.

5   Tate provided a urine sample but did not provide a hair sample at the time of the
6   initial interview.  (He alleges, in his complaint, that a hair sample could not be obtained
7   because he has very little hair.)  Tate was instructed to declare his use of drugs, whether
8   prescription or otherwise.  Tate did not declare any use of drugs at the time the samples
9   were taken.

10   As Tate concedes in his complaint, during the interview, he stated that he was "not
11   voluntarily entering any program administered by the [Foundation], but rather, his
12   participation was under duress due to Defendant Medical Staff's conditions."  Tate did not
13   sign the Conditions for Participation for Evaluation, and has never returned a signed copy
14   of the Conditions for Participation for Evaluation to the Foundation.

15   During the interview, Mansky explained that the Foundation does not provide any
16   evaluation or treatment, but assisted physicians in obtaining care from third parties.

17   At the conclusion of the interview, Tate advised Mansky that he would think about
18   becoming a participant in the program.  Tate directed Mansky to not release the results of
19   toxicology testing to anyone, including UMC.  Mansky advised Tate that the results would
20   not be released without Tate's consent and without full completion of the Conditions for
21   Participation for Evaluation and the Profile.

22   On February 4, 2009, Tate's counsel asked Mansky for the results of the toxicology
23   testing.  Mansky informed Tate's counsel that he "need[ed] the completed profile including
24   all medications Dr. Tate is on in order to let you and him know the results as interpreted by
25   an MRO."

26

1       On February 5, 2009, Mansky sent an e-mail to Tate indicating Mansky's
2   understanding that Tate did not wish to participate in the program, that Tate did not feel
3   that he had an illness or a need for wellness, especially a need to work on coping style,
4   and that Mansky would be pleased to send a letter indicating this to any medical entities
5   along with the results of the toxicology studies.  Mansky also informed Tate that his urine
6   toxicology was positive for Phenobarbital.

7       Tate was re-credentialed for two additional three-month terms, with the same
8   conditions, in February and May 2009.

9       In July and August 2009, Tate's counsel and the Foundation's counsel exchanged
10  letters.

11      On August 31, 2009, Tate's clinical privileges were terminated because he failed to
12  meet the three conditions.

13      Tate alleges claims against Mansky for declaratory and injunctive relief arising from
14  the termination of his clinical privileges, for conspiring to suspend his clinical privileges, for
15  tortiously interfering with Tate's contractual relations, and for negligence.

16              Analysis - Injunctive and Declaratory Relief

17      Mansky is entitled to summary judgment on Tate's claim for declaratory and
18  injunctive relief for numerous reasons.  First, the claim and the general factual allegations
19  fail to allege necessary facts relevant to the relief that Tate requests. Tate's complaint
20  alleges claims against numerous defendants, including UMC, the Trustees, the Medical
21  Staff and several individual defendants including Mansky.  In such circumstances, it is
22  particularly important for the plaintiff to allege facts that provide each defendant with notice
23  of the conduct for which the plaintiff seeks to hold that defendant liable.  Nevertheless,
24  Tate asserts that "Defendants" (ie, all defendants) improperly took several adverse actions,
25  as defined in the bylaws and other regulating documents of the Defendant Medical Staff,
26  which caused the termination of the medical privileges of Plaintiff at UMC."  Complaint, ¶

7

138.  Tate fails to identify any factual allegation in his complaint suggesting what adverse action–as defined by the bylaws and other regulating documents of the Medical Staff–were taken by Mansky.  Tate asserts that "Defendants" (again, all defendants) should not have taken action to terminate his clinical privileges.  Tate fails, however, to identify any factual allegation in his complaint suggesting that Mansky took any action to terminate Tate's clinical privileges.  As relief, Tate requests an order requiring "Defendants" to withdraw the revocation of his clinical privileges and to remove any records of the revocation from "Defendants" records.  Tate fails to explain how Mansky can provide this relief.  The failure to allege facts specifically concerning the actions of Mansky is sufficient reason to dismiss the claim.

Second, while Tate's claim for injunctive and declaratory relief rests upon 42 U.S.C. §1983, he has not alleged facts or offered evidence that Mansky acted under color of law.  To maintain a claim under §1983, a plaintiff must show two essential elements: "(1) that a person acting under color of state law (2) committed an act that deprived the claimant of some right, privilege, or immunity protected by the Constitution or laws of the United States."  *Redman v. County of San Diego*, 942 F.2d 1435, 1439 (9th Cir. 1991); *West v. Atkins*, 487 U.S. 42, 48 (1988).

Tate argues that Mansky is an actor under the color of state law because the Foundation contracts with the State Board of Medical Examiners to provide a diversion program.  Even assuming that Mansky acts under color of law in conducting the diversion program for the State Board of Medical Examiners, such conclusion is irrelevant to the present action. Tate was not participating in the State Board of Medical Examiner's diversion program.  As such, Mansky's actions towards Tate were not performed as part of the Foundation's contract with the State Board of Medical Examiners.  The relevant issue is not merely whether Mansky is an actor under color of law in some circumstances not relevant to Tate's claim, but whether Mansky was acting under color of law when he

committed (or omitted committing) the acts depriving Tate of a protected property interest. *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 835 (9th Cir. 1996) ("If a government officer does not act within the scope of employment or under color of state law, then that government officer acts as a private citizen.") As Mansky was not acting under color of state law, he is entitled to summary judgment.

Third, Tate has not shown that Mansky engaged in any action (or refused to engage in a required action) that deprived him of a constitutionally-protected right.  Initially, the Court would note some difficulty identifying Mansky's conduct that Tate alleges deprived him of a protected property right.  In his opposition addressing this issue, Tate asserts that he "requested that the results from the drug and alcohol screening be provided to Defendants Medical Staff and UMC."  Tate Opposition, p. 14, ll. 19-20.  As support for this assertion, however, he cites to a letter that his counsel wrote to the Foundation's counsel, in which his counsel asserted that "Tate has already completed drug and alcohol testing with [the Foundation].  Perhaps a letter regarding such to UMC would be beneficial in meeting this step."  Exhibit 12 to Mansky's Motion.  Such evidence is insufficient to establish that Mansky failed to provide the results of the toxicology screening to UMC and Medical Staff.  Assuming that counsel's suggestion ("perhaps a letter . . . to UMC would be beneficial") was a request, and assuming that such request imposed an obligation to engage in a legally required act, counsel did not direct that request to Mansky, but to counsel for the Foundation.  Further, contrary to his argument, counsel's "request" did not seek to have the Foundation provide the results of the toxicology screening to Medical Staff and UMC.  Rather, Tate's counsel sought a letter regarding Tate's completion of drug and alcohol testing.  While the evidence shows that Mansky could have (and indeed was willing to) provide the results of the toxicology screening to any medical entities, Tate has not offered any evidence that Mansky (or the Foundation) could have sent a letter confirming that Tate had completed drug and alcohol testing.  Assuming Tate seeks to hold Mansky

1   liable for failing to send UMC a letter confirming that Tate completed drug and alcohol

2   testing (or screening), he has not offered any evidence that he requested Mansky to send

3   this letter.

4          Fourth, Tate has not shown that the failure to send UMC or Medical Staff the results

5   of the toxicology screening deprived him of a property right.  Without dispute, Tate alleges

6   that he lost his clinical privileges, which are a protected property interest.  Also without

7   dispute, however, is that he asserts that he lost those privileges for failing to comply with

8   the three conditions set by the MEC: that Tate (1) obtain a full mental and physical

9   evaluation under the auspices of the Foundation, (2) obtain an evaluation for drug and

10  alcohol dependence under the auspices of the Foundation, and (3) enroll in an anger

11  management program under the auspices of the Foundation.  Even if the Court assumes

12  that Tate's results for the toxicology screening in connection with Mansky's initial interview

13  satisfied the condition that he obtain an evaluation for drug and alcohol dependence, Tate

14  has not shown that he satisfied either of the other two requirements.[2]  Thus, even if the

15  Foundation had provided UMC with his toxicology results, Tate's own allegations establish

16  that he would nevertheless have lost his clinical privileges.  Accordingly, for all of the above

17  reasons, Tate's first claim for relief must be dismissed with prejudice as to Mansky.

18

19

20  ─────────────────

21          [2]      Tate asserts, in the introduction to his opposition, that he "submitted to a
    mental and physical examination."  He provides no evidence.  Rather, the record
22  establishes only that he attended an initial interview, but did not comply with the
    requirement that he attend by himself.  Subsequent to the interview, Tate made a decision
23  to not participate in the program for evaluation purposes.
           In addition, in deciding the liability of Mansky, the Court finds irrelevant the question
24  whether Tate failed to complete all three requirements because he did not engage in the
    actions necessary to complete the requirements or because (as his counsel asserted in
25  letters to the Foundation and implies in his opposition) the MEC imposed requirements that
    were impossible for Tate to fulfill.  Under the former circumstance, such failure is
26  attributable to Tate, not to Mansky.  Under the latter circumstance, such failure would be
    attributable to the MEC, not to Mansky.

<u>Conspiracy</u>

A review of Tate's complaint reveals the lack of any factual allegation supporting an inference that Mansky and any other defendant formed a conspiracy or engaged in any acts pursuant to that conspiracy.  In opposition, Tate's sole evidentiary support for his conspiracy claim against Mansky is that in September 2005, during a Fair Hearing at UMC concerning another physician, Mansky testified that he had received a call from co-defendant Ellerton regarding the other physician.  That Mansky received a phone call from Ellerton at some point prior to a Fair Hearing that occurred more than three years prior to the events underlying the instant action does not raise a plausible claim that Mansky conspired with any person in this action.

<u>Tortious Interference with Contractual Relations</u>

As summarized by Tate, to maintain his claim for tortious interference with contractual relations, he must establish (1) a valid and existing contract, (2) defendant's knowledge of the contract, (3) intentional acts intended or designed to disrupt the contractual relationship, (4) actual disruption of the contract, and (5) damage.  *Sutherland v. Gross*, 105 Nev. 192 (1989).

While Tate argues that he "is party to a number of contracts with the Defendants," he supports the statement by reference to ¶323 of his complaint, which alleges he "had a valid and existing contract with Defendant Medical Staff by and through the Bylaws and related regulatory documents."  Tate does not cite to any allegation of his complaint nor offer any evidence that Mansky was aware of this alleged contract between Tate and the Medical Staff.

More significantly, however, Tate has not offered any evidence raising a material issue of fact suggesting that Mansky engaged in intentional acts intended or designed to disrupt the alleged contract.  He asserts that "Mansky failed to report the results of the drug and alcohol screening, despite Plaintiff's request to do so."  Tate's Opposition, p. 16, ll. 4-5.

11

1   As previously discussed, the record establishes that Tate did not make any such request of
2   Mansky.

3        Citing ¶¶ 88, and 338-339 of his complaint, Tate asserts that Mansky "refused to
4   acknowledge that any relationship existed."  Paragraph 88, however, alleges that the
5   Foundation denied that Tate had ever participated with the Foundation.  Further, Exhibit 15
6   to Mansky's Motion is the August 3, 2009, letter from the Foundation's counsel to Tate's
7   counsel, in which she states "Tate is not, nor has ever been, a participant in the Nevada
8   Physician's Health Program ('NPHP') as administered by the Nevada Health Professionals
9   Assistance Foundation ('NHPAF')."  As will be discussed, the evidence supports the
10  statement of Foundation's counsel that Tate had not been a participant in the Foundation's
11  program.

12       Paragraph 338 alleges that Mansky refused to report the results of Tate's drug and
13  alcohol screening to UMC and Medical Staff.  As previously discussed, the record
14  establishes that Tate did not make any such request of Mansky (or of the Foundation).

15       Paragraph 339 alleges that Mansky denied evaluating Tate.  While the record lacks
16  any evidence that Mansky denied evaluating Tate, it also establishes that Mansky did not
17  evaluate Tate.  Mansky conducted an initial interview to determine whether Tate could
18  participate in the Foundation's program, which Tate attended with his counsel contrary to
19  Mansky's directions.  Prior to the interview, Mansky explained to Tate and his counsel that
20  the Foundation's function was to facilitate a physician obtaining an independent medical
21  evaluation, and that it would be likely that Tate would be requested to undergo the
22  "multidisciplinary Independent Medical Evaluation at a National Center which deals with
23  physicians and is approved by our program."  Exhibit 6 to Mansky's Motion.  Mansky
24  indicated that Tate would need to "request he be interviewed for program participation."  Id.
25  Mansky expressly instructed that Tate needed "to appear by himself for the interview."  Id.,
26  Exhibit 7.

1       Finally, the Foundation's Conditions for Participation for Evaluation reiterates that the

2   Foundation did not conduct the evaluation, but "provide[ed] guidance for the participant

3   through evaluation and treatment."  Exhibit 4 to Mansky's Motion.  The Conditions for

4   Participation for Evaluation are effective from the date the Conditions are signed through

5   the completion of the physician's evaluation as determined by the Foundation and either

6   the Foundation indicates that treatment for health or wellness is not required or the

7   physician signs a Conditions for Participation for participation in the program.  Tate never

8   signed the CFP for evaluation.

9       Tate never met with Mansky without his counsel.  Indeed, the bulk of Tate's

10  interaction with Mansky or the Foundation was through his counsel, contrary to the

11  requirements for his participation for evaluation.

12       Finally, as Tate alleges and concedes in his complaint, he did not agree to voluntarily

13  participate in the Foundation's program.

14       In sum, the evidence establishes that Mansky attempted to conduct an initial

15  interview with Tate.  Tate, however, did not even comply with the requirement of attending

16  the interview by himself.  The initial interview was not an evaluation.  The initial interview

17  preceded Tate's entry into the evaluation phase of the Foundation's program, which

18  Mansky explained would be conducted by an Independent Medical Evaluation, most likely

19  at a National Center.  Tate declined to participate in the Foundation's program by which the

20  Foundation would facilitate his evaluation.  Accordingly, having never participated in the

21  Foundation's program, and having never received an evaluation facilitated by the

22  Foundation which Mansky could disclose to UMC and Medical Staff, Tate cannot maintain a

23  claim against Mansky for interfering with a contract by not disclosing an evaluation that was

24  never performed because Tate precluded it from being performed.  The Court will grant

25  summary judgment in favor of Mansky on this claim.

26

<u>Negligence</u>

For the same reasons previously recited by the Court relative to Tate's claims for injunctive relief and tortious interference, this claim also fails.  Tate again argues that, but for the failure to transmit the toxicology results to UMC, his clinical privileges would remain intact.  As the Court has previously discussed, Tate never requested Mansky to transmit the toxicology results.  In addition, the record refutes Tate's assertion that, but for the failure to transmit the toxicology results, he would not have lost his clinical privileges.

Accordingly, for good cause shown,

THE COURT **ORDERS** that Defendant Peter Mansky, M.D.'s Motion to Dismiss (## 22, 24), which the Plaintiff and the Court have treated as brought pursuant to Fed. R. Civ. Pro. 56, is GRANTED.

THE COURT FURTHER **ORDERS** that Plaintiff James S. Tate, Jr., M.D.'s Complaint is DISMISSED with prejudice as against Defendant Peter Mansky, M.D.

DATED this ____ day of September, 2010.

_____
Lloyd D. George
United States District Judge

14