1
2
3
4
5
6
7  # UNITED STATES DISTRICT COURT
8  # DISTRICT OF NEVADA
9
10 JAMES S. TATE, JR., M.D.,
11        Plaintiff,                          Case No. 2:09-cv-01748-LDG (NJK)
12 v.                                         **ORDER**
13 UNIVERSITY MEDICAL CENTER OF
   SOUTHERN NEVADA, *et al*.,
14
15        Defendants.
16
17        From 1990 through 2006, the plaintiff James S. Tate, Jr., M.D., applied for and was
18 credentialed as a member of the Medical and Dental Staff of University Medical Center (the
19 Medical Staff).  Each credentialing appointment was for a period of two years.  In
20 connection with his membership in the Medical Staff, Tate requested and was granted
21 certain clinical privileges at University Medical Center of Southern Nevada (UMC).  In 2008,
22 Tate again applied for credentialing, but he was re-appointed to staff membership for three
23 months, rather than two years.  Tate was further required to satisfy three conditions during
24 the three-month period.  Tate received similar three-month reappointments in February and
25 May, 2009.  On August 31, 2009, Tate was informed that his appointment had expired and
26 he could no longer exercise clinical privileges at UMC.  The letter asserted that Tate had

1   not provided notice of compliance with the three conditions of re-appointment and had not

2   requested an extension.  Tate then brought the instant suit alleging a violation of

3   procedural due process under 42 U.S.C. §1983, breach of contract, and a breach of good

4   faith and fair dealing against UMC, the Medical Staff, the Trustees of UMC, and Dr. John

5   Ellerton, Chief of Staff for the Medical Staff.[1]  The defendants now move for summary

6   judgment on all claims (#86).  Tate moves for a partial summary judgment establishing that

7   the defendants are liable on his §1983 claim (#87).  The parties have filed oppositions and

8   replies to the respective motions.  Having considered the pleadings, the arguments of the

9   parties, and admissible evidence in the record, the Court finds that the defendants are

10  entitled to summary judgment on each of Tate's claims.

11  <u>Motion for Summary Judgment</u>

12          In considering a motion for summary judgment, the court performs "the threshold

13  inquiry of determining whether there is the need for a trial—whether, in other words, there

14  are any genuine factual issues that properly can be resolved only by a finder of fact

15  because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty*

16  *Lobby, Inc.*, 477 U.S. 242, 250 (1986); *United States v. Arango*, 670 F.3d 988, 992 (9th Cir.

17  2012).  To succeed on a motion for summary judgment, the moving party must show (1)

18  the lack of a genuine issue of any material fact, and (2) that the court may grant judgment

19  as a matter of law.  Fed. R. Civ. Pro. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

20  (1986); *Arango*, 670 F.3d at 992.

21          A material fact is one required to prove a basic element of a claim.  *Anderson,* 477

22  U.S. at 248.  The failure to show a fact essential to one element, however, "necessarily

23  renders all other facts immaterial."  *Celotex*, 477 U.S. at 323.  Additionally, "[t]he mere

24  _____

25          [1]     Tate has also named Dr. Dale Carrison, the current Chief of Staff of the
    Medical Staff, as a defendant.  Tate acknowledges that he has named Carrison solely in
26  his representative capacity on behalf of the Medical Staff.

1  existence of a scintilla of evidence in support of the plaintiff's position will be insufficient."

2  *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 638 (9th Cir. 2012) (quoting

3  *Anderson*, 477 U.S. at 252).

4        "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after

5  adequate time for discovery and upon motion, against a party who fails to make a showing

6  sufficient to establish the existence of an element essential to that party's case, and on

7  which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  "Of

8  course, a party seeking summary judgment always bears the initial responsibility of

9  informing the district court of the basis for its motion, and identifying those portions of 'the

10  pleadings, depositions, answers to interrogatories, and admissions on file, together with the

11  affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material

12  fact." *Id.* at 323.  As such, when the non-moving party bears the initial burden of proving,

13  at trial, the claim or defense that the motion for summary judgment places in issue, the

14  moving party can meet its initial burden on summary judgment "by 'showing'–that is,

15  pointing out to the district court–that there is an absence of evidence to support the

16  nonmoving party's case." *Id.* at 325.  Conversely, when the burden of proof at trial rests on

17  the party moving for summary judgment, then in moving for summary judgment the party

18  must establish each element of its case.

19        Once the moving party meets its initial burden on summary judgment, the non-

20  moving party must submit facts showing a genuine issue of material fact.  Fed. R. Civ. Pro.

21  56(e); *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1103 (9th Cir.

22  2000).  As summary judgment allows a court "to isolate and dispose of factually

23  unsupported claims or defenses," *Celotex*, 477 U.S. at 323-24, the court construes the

24  evidence before it "in the light most favorable to the opposing party." *Adickes v. S. H.*

25  *Kress & Co.*, 398 U.S. 144, 157 (1970).  The allegations or denials of a pleading, however,

26  will not defeat a well-founded motion.  Fed. R. Civ. Pro. 56(e); *Matsushita Elec. Indus. Co.*

3

1   *v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  That is, the opposing party cannot " 

2   'rest upon the mere allegations or denials of [its] pleading' but must instead produce

3   evidence that 'sets forth specific facts showing that there is a genuine issue for trial.' "

4   *Estate of Tucker v. Interscope Records*, 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting Fed.

5   R. Civ. Pro. 56(e)).

6        Factual Background

7        UMC is a public county hospital in Clark County, Nevada, formed and organized

8   pursuant to NRS §450 *et al.,* and supported through taxpayer funds.  *See* Nev. Rev. Stat.

9   450.020-.060.  Clark County's Board of County Commissioners is, *ex officio*, the Board of

10  Trustees for UMC.  Nev. Rev. Stat. 450.090.  Pursuant to §450.160 and .440, the Medical

11  Staff organized themselves in conformity with Bylaws approved by the Trustees.  In 2008,

12  Dr. John Ellerton served as Chief of Staff of the Medical Staff.  In December 2009, Dr. Dale

13  Carrison was elected Chief of Staff.

14       Tate was first appointed to membership in the Medical Staff of UMC in 1990.  The

15  term of his first appointment, and each of his reappointments thereafter until 2008, was for

16  a period of two years.  In July 2008, Tate re-applied for his credentials, which were set to

17  expire at the end of November 2008.  In connection with each of his credentialing

18  applications (including his application in July 2008), Tate requested and was granted

19  specific clinical privileges in UMC's Trauma and Surgery Departments.

20       In August 2008, Tate was involved in an incident with the family of a patient that

21  resulted in his removal from the on-call schedule of UMC's Trauma Department.

22       On October 28, 2008, the Medical Executive Committee (MEC) of the Medical Staff

23  recommended that Tate be reappointed to the Medical Staff for a term of three months.

24  Ellerton did not provide Tate with a "special notice" under Article II.M.1 of the Credentialing

25  Manual of the MEC's recommendation, nor did he notify Tate of the procedural rights under

26  the Fair Hearing Plan.

4

1    On November 18, 2008, the Trustees approved the reappointment of Tate for a

2 three-month term.  By letter of that same date, the MEC notified Tate of the reappointment

3 and further informed him that, during the three-month period, he was required to obtain and

4 provide the Medical Staff with:

5         1.     A full mental and physical evaluation under the auspices of the Nevada
               Health Professionals Assistance Foundation.
6
         2.     An evaluation for drug and alcohol dependence under the auspices of
7               the Nevada Health Professionals Assistance Foundation.

8         3.     Demonstrate evidence of enrollment in an anger management
               program under the auspices of the Nevada Health Professionals
9               Assistance Foundation.

10    In connection with his reappointment to the Medical Staff, Tate's requests for

11 specific clinical privileges in the Trauma and Surgery Departments were approved for this

12 three-month period.

13    In a letter to Ellerton dated December 16, 2008, Tate indicated he was working,

14 albeit under protest, with Dr. Mansky (of the Nevada Health Professionals Assistance

15 Foundation (Foundation)) to meet the three requirements.  Tate also stated that the letter

16 was a formal request for a Fair Hearing to challenge the "conditional reappointment" as

17 "[t]he limited reappointment period and the conditions upon which the reappointment was

18 made [were] a limitation of [his] clinical privileges."

19    As this Court previously found (in granting Mansky's motion for summary judgment),

20 the Foundation, for which Mansky is the Director, is used by the State Board of Medical

21 Examiners and the State Osteopathic Board as a diversionary program for troubled

22 practitioners.  The Foundation uses an "illness or wellness approach based on independent

23 medical evaluation, treatment, and monitoring."  Mansky Declaration, ¶ 5.  As summarized

24 by Mansky, the Foundation

25         facilitate[s] evaluation and treatment of clinicians suffering from addictive,
         psychiatric illness or difficulty coping effectively with their work environment or
26         stress inherent in the practice of medicine.  The [Foundation] does not treat,

> or enter into a physician-patient relationship or diagnose those who seek to participate in the foundation. The [Foundation] works to facilitate evaluation for clinicians who appropriately enter the program by signing [the Foundation's] Conditions For Participation agreement and are accepted.

Before a professional is accepted into the program he must pay for and complete an initial interview and provide toxicology samples, agree to and sign a "CFP for Evaluation,"[2] and must complete a "Participant Profile." The Foundation works directly with the professional and not through an intermediary.

Sometime in December 2008, Tate's counsel made an initial inquiry with Mansky. Mansky provided a brief written explanation of the Foundation's program to Tate's counsel. The letter explained the Nevada Health Professional Program, indicating that participation in the program is voluntary, that recommendations for treatment are determined based on Independent Medical Evaluations, and that a "requirement for working with the [program] is to work directly with participants not through a third party representing the clinician." Exhibit 5 to Mansky's Motion. On December 18, 2008, Mansky sent Tate's counsel an e-mail. Manksy noted that while a hospital may mandate a professional's participation in the program, the Foundation would only "accept a physician for participation if he/she makes a voluntary decision to enter our program." Exhibit 6 to Mansky's Motion. In the same e-mail, Mansky informed counsel that Tate could "request that he be interviewed for program participation," and that "[a]fter the interview it is likely that we would request that Dr. Tate undergo a multidisciplinary Independent Medical Evaluation at a National Center which deals with physicians and is approved by our program." Id. Mansky further informed Tate's counsel that Tate would "need[] to contact the [program] himself and to appear by himself for the interview." Id.

On January 7, 2009, Tate contacted the Foundation by e-mail. Mansky responded by e-mail, to which was attached the Participant Profile, which Mansky requested be

---

[2]     The Foundation's Conditions For Participation for Evaluation.

1   completed and returned.  Mansky further indicated that Tate would need to "include a 5

2   page statement (app. 1200 words) concerning the incidences of behavior that have been of

3   concern to the hospital in the past and the present incident," which would need to be

4   returned by January 15, 2009.  Exhibit 7 to Mansky's Motion.  Mansky further indicated that

5   he had reserved time on January 19th, for an interview with Tate.  Mansky reiterated that

6   the program was a voluntary program.  Id.  He further stated: "if you want to participate in

7   the [program] you must agree to work and communicate with the [program] directly and not

8   through a third party or third party intervention."  Id.  Mansky also attached copies of the

9   letter and e-mail sent to Tate's counsel.

10        Tate's initial interview with Mansky was re-scheduled to January 26, 2009.  Contrary

11   to the instruction that Tate would need to appear at the interview by himself, he appeared

12   accompanied by his counsel.  Tate was advised that if he wished to become a participant

13   in the program, he had to do so alone and without his attorney.  Tate insisted that his

14   counsel be present during the interview.

15        At some point, Tate returned the Participant Profile.  Tate provided a urine sample.

16   Tate was instructed to declare his use of drugs, whether prescription or otherwise.  Tate did

17   not declare any use of drugs at the time the sample was taken.

18        As Tate concedes in his complaint, during the interview, he stated that he was "not

19   voluntarily entering any program administered by the [Foundation], but rather, his

20   participation was under duress due to Defendant Medical Staff's conditions."  Tate did not

21   sign the Conditions for Participation for Evaluation, and has never returned a signed copy

22   of the Conditions for Participation for Evaluation to the Foundation.

23        During the January 26, 2009, interview, Mansky explained that the Foundation does

24   not provide any evaluation or treatment, but assisted physicians in obtaining care from third

25   parties.  At the conclusion of the interview, Tate advised Mansky that he would think about

26   becoming a participant in the program.  Tate directed Mansky to not release the results of

7

1 the toxicology testing to anyone, including UMC.  Mansky advised Tate that the results

2 would not be released without Tate's consent and without full completion of the Conditions

3 for Participation for Evaluation and the Profile.

4        On February 4, 2009, Tate's counsel asked Mansky for the results of the toxicology

5 testing.  Mansky informed Tate's counsel that he "need[ed] the completed profile including

6 all medications Dr. Tate is on in order to let you and him know the results as interpreted by

7 an MRO."

8        On February 5, 2009, Mansky sent an e-mail to Tate indicating Mansky's

9 understanding that Tate did not wish to participate in the program, that Tate did not feel

10 that he had an illness or a need for wellness, especially a need to work on coping style,

11 and that Mansky would be pleased to send a letter indicating this to any medical entities

12 along with the results of the toxicology studies.  Mansky also informed Tate that his urine

13 toxicology was positive for Phenobarbital.

14        In January 2009, Tate again submitted a credentialing application that included a

15 request for clinical privileges in Trauma and Surgery.  The MEC again recommended that

16 Tate be reappointed to staff membership for a three-month term with the same three

17 requirements.  Ellerton did not provide Tate with a special notice of the recommendation.

18 At its February 17, 2009, meeting, the Trustees approved the reappointment of Tate for a

19 three-month term.  During the public comment period of that meeting, Tate stated his belief

20 that the Board had not been provided "exactly candid information" about events at UMC,

21 that he had now been re-appointed twice to a three-month reappointment, which was

22 unprecedented, that no hospitals do that, and that hospitals reappoint to a cy cle of two

23 years.  Tate concluded his remarks regarding three-month reappointments by stating: "So

24 that might be a question you ask the hospital the next time they come down to present."

25        In March 2009, Tate again submitted an application for membership and a request

26 for privileges in Trauma and Surgery.  The MEC again recommended that Tate be

1   reappointed for a three-month term with the same three requirements.   Ellerton did not

2   provide Tate with a special notice of the recommendation.  The Trustees approved the

3   three-month reappointment.  By letter dated May 19, 2009, the MEC informed Tate of his

4   three-month reappointment from May 31, 2009, through August 31, 2009.  The MEC also

5   informed him of the same three requirements and that Tate was to provide the Chief of

6   Staff with "proof of completion/compliance on or before August 3, 2009."

7         In July and August 2009, Tate's counsel and the Foundation's counsel exchanged

8   letters regarding whether Tate had complied (or whether it was even possible for him to

9   comply) with the three requirements imposed by the MEC.

10         In an undated letter to Ellerton,[3] Tate asserted that he had complied with the first

11   two conditions of his reappointment by "submitting [himself] for evaluation by Dr. Manksy

12   for mental health and well-being," and because he had "provided urine samples and

13   attempted to provide hair samples, as they requested, for a drug and alcohol screening."

14   Tate further stated that compliance with the third condition was impossible because the

15   Foundation did not administer any treatment.

16         On August 31, 2009, a deputy district attorney for Clark County sent a letter to

17   Tate's counsel stating: "Dr. Tate has not provided notice of his compliance with the

18   conditions for continued processing of his application for reappointment.  As a result,

19   processing of Dr. Tate's application for reappointment has ceased."  The letter further

20   stated:

21             Dr. Tate's current appointment period ends today, August 31, 2009.
22     No extension of Dr. Tate's appointment to the UMC Medical Staff has been
       requested, and none has been granted.
23            Since Dr. Tate has allowed his appointment to expire through his
       inaction, as of September 1, 2009, Dr. Tate will no longer be permitted to
24     conduct any activities at UMC for which membership and privileges in the
       Medical Staff are required.  The voluntary relinquishing of one's membership
25     and privileges is not deemed an adverse action under the Bylaws of UMC's

26       [3]      Tate asserts the letter was sent August 21, 2009.

Medical and Dental Staff.  Therefore, there are no rights to a Fair Hearing for Dr. Tate.

At its September 15, 2009, meeting, the Trustees approved the MEC's recommendation to remove Tate from the Medical Staff for failing to complete reappointment.

Analysis - 42 U.S.C. §1983 Claim

To maintain a claim under §1983, a plaintiff must show two essential elements: "(1) that a person acting under color of state law (2) committed an act that deprived the claimant of some right, privilege, or immunity protected by the Constitution or laws of the United States." *Redman v. County of San Diego*, 942 F.2d 1435, 1439 (9th Cir. 1991); *West v. Atkins*, 487 U.S. 42, 48 (1988).

Protected Property Interest

Tate rests his §1983 claim on the Fourteenth Amendment's Due Process Clause, invoking the "guarantee of fair procedure" provided under this clause.  *Zinermon v. Burch*, 494 U.S. 113, 125 (1990); Doc. 87, p. 15, ll. 9-12.  "In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law."  *Id. Zinermon*, at 125.  Thus, to succeed on his procedural due process claim, Tate must establish both that he had a protected interest, that he was deprived of that interest, and that he did not receive constitutionally adequate due process in the deprivation of that interest.

Tate asserts that he had a protected property interest in clinical privileges at UMC. Doc. 87, p. 18, l. 4.  "The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits."  *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 576 (1972).  As stated by the Supreme Court:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral

> expectation of it.  He must, instead, have a legitimate claim of entitlement to it.
>   . . .
>       Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Id.*  In the present matter, and as summarized by Tate in his motion (and with which summary the defendants appear to agree), the scope and dimensions of a physician's property interest in clinical privileges at UMC are described by the *Bylaws* and the *Credentialing Procedures Manual* of the Medical Staff, each of which was approved by the Trustees.

At the outset, the Court must note, after carefully reviewing the *Bylaws*, the *Credentialing Procedures Manual*, the evidence properly before the court, and the arguments of the parties, the need for precision in the use of language regarding the protected interests described in those documents.  Article III of the *Bylaws* concerns membership in the Medical Staff, for which "Basic Licensure," "Performance," "Behavior," and "Health," are listed as the general qualifications.  Article IV of the *Bylaws* concerns, *inter alia*, the categories of staff membership, noted as "Active, Associate, Courtesy, Courtesy Consulting, Refer & Follow, Fellow, Visiting Consultant, Observational, Honorary, and Emiritus."  The prerogatives of Active status include "admit[ting] patients without limitations, except as otherwise provided in the Medical and Dental Staff Rules and Regulations," and "Exercise such clinical privileges as are granted to the staff member."  Article V of the *Bylaws* concerns the delineation of practice privileges.  Article V.B establishes that "[p]rivileges governing clinical practice are granted in accordance with prior and continuing education, training, experience, verified physical and mental health status and demonstrated current competence and judgment as documented and verified in each Physician's, Dentist's, or Podiatrist's credentials file, and verified mental and physical

1  health status adequate to permit the applicant to discharge the usual and customary tasks
2  necessary to the performance of his or her profession."

3        Once an application is submitted and verified, the Department in which an applicant
4  seeks privileges creates and transmits to the Credentials Committee a written report that
5  includes a "recommendation as to approval or denial of, and any special limitations on,
6  staff appointment, category of staff membership and prerogatives, Department and/or
7  division affiliation, and scope of privileges." *Credentialing Manual*, II.2.J.2.  The
8  Credentials Committee then transmits to the MEC a written report that includes
9  "recommendations as to approval or denial of, and any special limitations on, staff
10  appointment, category of staff membership and prerogatives, department or
11  section/division affiliation, and scope of clinical privileges." *Id*, at II.2.K.1.  The MEC, after
12  reviewing the application and supporting documentation and other relevant information
13  available to it, makes "recommendations as to approval or denial of, or any special
14  limitations on, staff appointment, category of staff membership and prerogatives,
15  department and/or division affiliation, and scope of clinical privileges."

16        Of particular relevance to the instant matter, Article II.2.M.1 establishes that an
17  "adverse recommendation" by the MEC is "a recommendation to deny appointment,
18  requested staff category, requested department and/or division assignment, or to deny or
19  limit requested clinical privileges."  When the MEC makes such an adverse
20  recommendation, the Chief of Staff "immediately so informs the applicant by special notice,
21  and he or she is then entitled to the procedural rights provided in the Fair Hearing Plan."
22  The defendants also bring Article XII of the *Bylaws* to the Court's attention, which article
23  concerns written complaints against a physician.  Article XII.A sets forth the procedural
24  rights of a physician, and Article XII.A.1.a defines the following as adverse
25  recommendations or decisions:

26        (1)    Denial of initial staff appointment;

(2)    Denial of reappointment;
(3)    Suspension of staff membership;
(4)    Revocation of staff membership;
(5)    Denial of requested appointment to or advancement in staff category;
(6)    Reduction in staff category;
(7)    Suspension or limitation of the right to admit patients or of any other membership prerogative directly related to the Physician's, Dentist's, or Podiatrist's provision of patient care;
(8)    Denial of requested department affiliation;
(9)    Denial or restriction of requested clinical privileges;
(10)   Reduction of clinical privileges;
(11)   Suspension of clinical privileges;
(12)   Revocation of clinical privileges;
(13)   Individual application of, or individual changes to, mandatory consultation requirement.

Further, such a recommendation or decision is deemed adverse only when "[r]ecommended by the MEC, Credentials Committee, department, or staff Physician, Dentist, or Podiatrist;" or when "[t]aken by the Board of Hospital Trustees under circumstances where no prior right to request a hearing existed."  *Bylaws*, Article XII.A.2.a & b.    Conversely, the following actions are *not* deemed adverse: "Neither the issuance of a warning, or a formal letter of reprimand, nor the imposition of a probationary period with retrospective review of practice but without special requirements of consultation or supervision, nor the denial, termination or reduction of Interim Privileges, *nor any other actions except those specified in Article XIII.A.1* [sic][4] entitle the Physician, Dentist, or Podiatrist to any hearing or appellate review rights."  Finally, in reviewing the *Credentialing Manual*, the Court notes that Article II.2.T provides that "[a]n applicant who has received a final adverse decision regarding appointment, staff category, department and/or division assignment or clinical privileges is not eligible to reapply to the Medical and Dental Staff or [sic] for the denied category, department, section, and/or division, or privileges for a period of two (2) years."

---

[4]    The context indicates that the correct reference is to Article XII.A.1, which sets forth the express list of adverse recommendations or decisions.

1    In his arguments, Tate points out that "[a]ppointments to the Medical and Dental

2  Staff are for a period of two (2) years except that the Medical Executive Committee may set

3  a more frequent appraisal period for the exercise of particular privileges in general or by

4  staff members who have identified health disabilities."  Tate asserts, and the defendants do

5  not dispute, that the particular privileges he requested were not subject to a more frequent

6  appraisal period in general and that he did not have an identified health disability.  He thus

7  concludes that, based upon his prior relationship with UMC and the Medical Staff and the

8  Bylaws, he was "legitimately entitled to two (2) year *privileging* period."  Tate's Motion for

9  Summary Judgment, p. 19, ll. 21-22.  The pertinent language of the *Bylaws*, however, does

10  not establish a two-year *privileging* period, but rather establishes that *appointments* to the

11  Medical Staff are for a period of two years.

12    As the Court has indicated above, precision in language is required in discussing the

13  protected interests relevant to credentialing.  Each recommendation made in connection

14  with a credentialing application requires recommendations (and ultimately decisions) to be

15  made with regard to several different aspects of credentialing; namely, appointment to the

16  staff, category of staff, prerogatives, department affiliation, and clinical privileges.  While a

17  denial of appointment to staff necessarily results in the denial of requested category of

18  staff, department affiliation, and clinical privileges, the converse is not true.  The *Bylaws*

19  and *Credentialing Manual* indicate that, despite a positive recommendation regarding

20  appointment to staff, the MEC can nevertheless make an adverse recommendation as to

21  the requested category of staff (which affects prerogatives), or the requested department

22  affiliation, or to specific requested clinical privileges.  Further, the *Credentialing Manual* and

23  *Bylaws* establish that a specific clinical privilege can be granted on a conditional or limited

24  basis, and that such limited or conditional recommendation as to the specific privilege is

25  considered an adverse recommendation.  Tate's own applications indicate that each

26  specific clinical privilege that he requested was granted without limitations or conditions.

1       The Court recognizes that, in previously considering the defendant's motion to
2   dismiss, the Court concluded that "[a]s an appointment is for a term of two years (except
3   under the circumstances identified in Bylaws Article III.G), an appointment for less than two
4   years (except under the circumstances identified in Bylaws Article III.G) is a limit of the
5   clinical privileges to which a physician is otherwise entitled, and is thus an adverse
6   recommendation."  In drawing this conclusion, the Court failed to draw the distinction
7   between appointment to staff, staff category, department affiliation, and clinical privileges
8   required by the *Bylaws* and the *Credentialing Manual*.  Those documents establish that the
9   scope of a physician's interest in clinical privileges is related to, but distinct from, the
10  interest in appointment to staff, or the scope of a physician's protected interest in staff
11  category, or department affiliation.  The relevant *temporal* language in the *Bylaws* and
12  *Credentialing Manual* concerns the length of appointment to the Medical and Dental Staff,
13  not the length of a grant of clinical privileges.  Neither the *Bylaws* nor the *Credentialing*
14  *Manual* suggest that clinical privileges are granted for a period of two years, regardless of
15  the length of appointment to the medical staff.  The *temporal scope* of Tate's protected
16  interest in clinical privileges is dependent upon the *temporal scope* of his protected interest
17  in staff membership.  In short, the *Bylaws* and the *Credentialing Manual* do not, and
18  cannot, create a protected interest in clinical privileges for a specific length of time that is
19  greater than the protected interest in appointment to staff for a specific length of time.
20  Tate's protected interest in the period of his clinical privileges is contemporaneous to his
21  protected interest in the period of his appointment to staff, whether that staff appointment is
22  three months or two years.
23      That the temporal scope of clinical privileges is contemporaneous with the actual
24  appointment to staff is demonstrated in the present matter.  The record before the Court
25  reveals that the dispute between the parties does not concern a recommendation by the
26  MEC granting appointment to staff for two years, but limiting Tate's exercise of clinical

privileges to a period of three months.  Rather, at issue is the MEC's recommendation that Tate's appointment to staff be limited to a period of three months.  The result of that limited three-month appointment to staff necessarily imposed a three-month period upon not only clinical privileges, but also staff category and department affiliation.   Nothing in the record suggests that the recommendation of a three-month appointment to staff was prompted by any complaint concerning Tate's exercise of a specific clinical privilege, or the appropriateness of staff category, or department affiliation.  Nothing in the record suggests a concern that Tate's ability to perform a specific clinical privilege would degrade and require re-evaluation after three months.  Rather, in response to a negative incident involving Tate and the family member of a patient, the MEC recommended a shortened term of appointment to staff, during which Tate was required to complete three conditions requiring an evaluation of mental health, drug and alcohol use, and participation in an anger management program.

The Court also assumed, in reaching its prior conclusion, that the *Bylaws* and *Credentialing Manual* establish a protected interest not merely in appointment to the medical staff, but in a two-year appointment to medical staff.  The Court, however, neither expressly analyzed this issue nor concluded that the *Bylaws* and *Credentialing Manual* created a protected interest in a two-year appointment.  Resolution of that question, however, indicates that Tate had, at most, a protected interest in appointment to the medical staff, but not a protected interest in a two-year appointment to medical staff. Without doubt, Article III.G establishes that "[a]ppointments to the Medical and Dental Staff are for a period of two (2) years."  Standing alone, however, Article III.G's reference to a two-year period does not reveal whether it is merely an expression of expectation or the delineation of an entitlement.  The *Bylaws* and *Credentialing Manual* indicate that an adverse recommendation or decision regarding appointment to staff occurs only when the appointment to staff is denied.  None of the definitions of adverse actions within either the

1    *Bylaws* or the *Credentialing Manual* expressly recognize a shortened appointment to staff

2    as an adverse action.  While it would be facile to state that the appointment to a three-

3    month appointment is the denial of an "appointment," because Article III.G states that

4    appointments are for a period of two years, such a conclusion appears contradicted by

5    Article II.T of the *Credentialing Manual.*  That article prohibits an applicant who has

6    received a final adverse decision regarding appointment from re-applying for staff

7    membership for a period of two years.  Thus, Article II.T indicates that a three-month

8    appointment would constitute a denial of appointment only when such limited appointment

9    also precluded any re-application for a period of two years.  In this matter, however, Tate

10   twice re-applied for credentials during the first two shortened appointments, and the MEC

11   did not reject those applications pursuant to Article II.T, but instead acted upon each of

12   those applications to again recommend a shortened appointment.

13          Thus, the Court concludes that, for credentialing applicants, the *Bylaws* and

14   *Credentialing Manual* do not create or define a protected interest in a <u>two-year</u> appointment

15   to staff membership.  Rather, these documents create a protected interest in appointment

16   to staff membership, but only an expectation (that is, not an entitlement or protected

17   interest) that such appointment will be for a period of two-years.  The Court further

18   concludes that, for credentialing applicants, the *Bylaws* and *Credentialing Manual* do not

19   create a protected interest in clinical privileges that is greater than the protected interest in

20   appointment to staff.  As such, in re-applying for credentials, Tate did not have a protected

21   interest in being granted clinical privileges for a two-year period, or for any period

22   exceeding his appointment to staff.  Accordingly, as Tate lacked a protected interest in a

23   two-year appointment to staff, he cannot maintain his §1983 claim against any defendant.

24          The Court would further note that, even if Tate had a protected interest in

25   appointment to staff for a period of two years (rather than simply a protected interest in

26   appointment to staff), his §1983 claim fails against each of the defendants.  Tate has not

1    shown that either the Trustees or UMC participated in or had responsibility for the denial of

2    due process relative to his shortened appointments to staff.  Similarly, as Tate named

3    Carrison merely as a representative of the Medical Staff, he acknowledges that Carrison

4    did not participate in the alleged constitutional deprivation.  As to the Medical Staff, Tate

5    amended his complaint in this matter for the specific purpose of alleging that the Medical

6    Staff is an unincorporated association of private physicians.  As an unincorporated

7    association of individuals, the Medical Staff is not a "person" that can be sued for relief

8    under §1983.  Finally, assuming that Tate had a protected interest in a two-year

9    appointment to medical staff (as opposed to a protected interest only in appointment to

10   medical staff without regard to the length of that appointment), the Court cannot conclude

11   that such was clearly established law when the MEC recommended, and the Trustees

12   approved, Tate's reappointment to medical staff for periods of three months.  As such,

13   Ellerton is entitled to qualified immunity even if Tate had a protected interest in a two-year

14   appointment to staff.

15            <u>Analysis - Contract Claims</u>

16            For purposes only of the instant opinion, the Court assumes without deciding that

17   each of Tate's re-applications for credentialing created a contract with at least one of the

18   defendants.  The Court also assumes that, by accepting the offer of a three-month

19   appointment, Tate entered into a contract with at least one of the defendants, which

20   contract incorporated the terms of the *Bylaws* and other governing documents, including

21   the letter offering appointment for three months with conditions to be met by Tate during

22   the reappointment.  Nevertheless, the Court concludes that summary judgment is

23   appropriate in favor of the defendants as to both Tate's contract and good faith and fair

24   dealing claims.

25            Construed broadly, Tate's contract claims allege two different sets of contracts: a set

26   of contracts created by his application for credentials, and a set of contracts created by his

18

1   appointment to the medical staff.  The contracts involving his applications for credentials

2   necessarily require the Court to find that the application, itself, constitutes part of those

3   contracts.  As shown by the defendants, the applications included waivers by which Tate

4   agreed to release the defendants from liability for acts made in connection with the

5   credentialing process.  Tate cannot require that the Court strictly construe the terms of the

6   *Bylaws* and other documents without also strictly construing his release of liability for acts

7   made in connection with the credentialing process.  With respect to the credentialing

8   process, Tate's complaint, and his opposition, indicate that he seeks to hold the

9   defendants liable for decisions made and imposed regarding the offered length of

10   appointment and the required conditions that must be met upon acceptance of

11   appointment.  Tate released all parties from liability for their acts in making

12   recommendations or decisions regarding the length of appointment and the conditions of

13   appointment.

14         To the extent that Tate asserts contract claims resulting from the termination of his

15   membership after three months, rather than after two years, the claims must fail.  As Tate

16   concedes in his Second Amended Complaint, each of his reappointments at issue included

17   a term specific to him establishing that the period of appointment for his membership was

18   three months.  Accepting Tate's argument that a hospital is not under a pre-existing

19   obligation to extend an offer of membership to a physician, and that a contract is formed

20   when the physician accepts a hospital's offer of membership, the offers of membership at

21   issue in this case clearly specified that Tate's terms of appointment would be for three

22   months, rather than the two years set forth in the *Bylaws* and otherwise generally

23   applicable to appointments of physicians.

24         Accordingly, assuming the existence of a contract between Tate and any defendant

25   arising from his application for credentials, the Court finds that Tate has released the

26   defendants from liability for acts committed in connection with the credentialing process,

19

1 including those acts leading to and involving the decision to offer re-appointment for a term

2 of three months with specific conditions.  Further, assuming the existence of a contract

3 between Tate and any of the defendants arising from his acceptance of appointment to

4 staff for a three-month period during which Tate was required to meet certain conditions,

5 the Court finds that Tate has not shown that any defendant acted in breach of any such

6 contract when each of his appointments expired after three months.

7           Therefore, for good cause shown,

8           THE COURT **ORDERS** that Defendants' Motion for Summary Judgment (#86) is

9 GRANTED;

10          THE COURT FURTHER **ORDERS** that Plaintiff's Motion for Partial Summary

11 Judgment (#87) is DENIED.

12

13 DATED this _____ day of March, 2013.

14

15                                              _____
                                                Lloyd D. George
16                                              United States District Judge

17

18

19

20

21

22

23

24

25

26